FILED
2007 Jun-12  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SUSAN KEY,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:06-cv-411-JHH** |
| **THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA,** | ) | |
| | ) | |
| **DEFENDANT.** | | |

**MEMORANDUM OF DECISION**

The court has before it the February 5, 2007 motion (doc. # 13) of defendant The Board of Trustees of the University of Alabama for summary judgment. Pursuant to the court's February 15, 2007 order, the motion was deemed submitted, without oral argument, on March 22, 2007.

**I. Procedural History**

Plaintiff Susan Key commenced this action on February 28, 2006 by filing a complaint in this court alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e., et seq. and the Equal Pay Act of 1963, 29 U.S.C. § 206(d).  Plaintiff contends that defendant's alleged conduct constitutes discrimination on the basis of sex regarding pay in violation of Title VII (Count I)

and the Equal Pay Act (Count III) and retaliation for engaging in statutorily protected activity in violation of Title VII (Count II).  Defendant's February 5, 2007 motion for summary judgment asserts that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief and evidence[1] (doc. # 17) in support of its own motion for summary judgment on February 20, 2007.  On March 15, 2007, plaintiff filed a brief (doc. # 21) and evidence[2] (doc. # 22) in opposition to defendant's motion for summary judgment.  On March 22, 2007, defendant filed a brief (doc. # 24) in reply to plaintiff's opposition.

## II.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] The defendant submitted the following evidence: deposition and exhibits of Dr. Robert Holmes; deposition and exhibits of Susan Key; affidavit of Dr. Lance Nail; affidavit of Dr. Frank Massina with exhibits; affidavit of Dr. Robert Holmes with exhibits, including salary history for plaintiff; 2003 and 2004 annual faculty activity reports of management, marketing and industrial distribution faculty.

[2] The plaintiff submitted the following evidence: affidavit of Dr. Susan Key; December 1, 2000 policies and procedures for School of Business/Graduate School of Management; Dr. Key's charge of discrimination and exhibits; Dr. Key's curriculum vitae; affidavit of Dr. Vickie Cox-Edmondson; e-mail from Dr. Louis Dale to Dr. Vickie Cox Edmondson and Dr. George M. Munchus III.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324. The summary judgment rule applies in job discrimination cases just as in other cases. Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

4

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff, Dr. Susan K. Key currently holds the position of Associate Professor in the Department of Management, Marketing, and Industrial Development (MMID) within the School of Business at the University of Alabama at Birmingham (UAB).  (Key Dep. at 11.)  She was hired in 1995 as an assistant professor.  (Id. at 17; Ex. 10 to Key Dep.)   Her starting salary was $53,000 per year for a nine-month contract.  (Ex. 1 to Holmes Aff.)  While an assistant professor, Key received the Odessa Woolfolk Service Award in 1998, and was the Outstanding Faculty Woman of the Year in 1999.  (Key Dep. at 132-33.)

In 2001, Key was promoted to associate professor by Dean Robert Holmes.  (Id. at 18.)  At some point after this promotion, during the 2001-2002 academic year, Key was granted tenure, under Dean Holmes.  (Id.; Ex. 1 to Holmes Aff.)  After she received tenure, Key applied for an administrative position and Dean Holmes appointed her to this position.[4]  (Key Dep. at 18.)  In September 2001, Key

---

[3] These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994).  If the facts are in dispute, they are stated in a manner most favorable to the non-movant.  See Fitzpatrick, 2 F.3d at 1115.

[4] Key testified that when she applied for her administrative appointments, the interviews with Dean Holmes focused almost exclusively on her gender. (Key Dep. at 161.)  Instead of asking Key about her background, qualifications, or previous leadership roles, Key testified that Dean Holmes focused the discussion on problems he had with previous female administrators.  (Id. at 162.)

was appointed to the director position of the Ph.D. program jointly offered by the

School of Business and the School of Health  Related Professions.  (Id.; Ex. 1 to

Holmes Aff.)  She received a ten percent pay raise for assuming these

administrative duties.  (Key Dep. at 22; Ex. 1 to Holmes Aff..)  Key resigned from

this position in 2003 because, in her view, Dean Holmes  continuously denigrated

the program to other faculty members.  (Key Dep. at 18-19, 24-27.)  She testified

that she stepped down as director of the program to "call some attention to" the

Dean's lack of dedication to the program.  (Id. at 21.)

Key also stepped down because she did not have as much time for research

because of the added administrative duties combined with the course load the Dean

assigned her while she was administrator.  (Id. at 30-35.)  She testified that she

asked for a reduced load of three courses for the fall semester, two in the spring

semester, and one in the summer semester.[5]  (Id. at 34.)  Instead, Dean Holmes gave

her a reduced load of three courses in the fall, three in the spring, and one in the

summer.  (Id.)  Key stated that she accepted the administrative position, even

without the particular reduced load that she requested, because she did not know

how much time the administrative position would really occupy.  (Id. at 35.)  Key

---

[5] The normal course load is three courses in the fall, three in the spring, and two in the
summer.  (Key Dep. at 34.)

testified that "after being in the [administrative] job for two years, [her] research was being affected." (Id.)

## A. Academic Structure, Salary and Raises

### 1. Academic Structure

There exists an academic hierarchy among professors. The top rank is that of a full professor, and the next rank is that of an associate professors. (Holmes Dep. at 39.) Below associate professors is the rank of assistant professors, and the bottom rank is that of instructors. (Id.) At UAB, the difference between an associate professor and an assistant professor is that there are higher expectations of an associate professor "in terms of providing overall leadership to the faculty in engagement and service and continuing to produce . . . high quality research." (Id. at 42-43.) In addition, at UAB, assistant professors cannot serve on a promotion and tenure committee under the school's policies. (Id. at 43-44.) In general, associate professors have higher salaries than assistant professors, but there are many exceptions to that general rule. (Id. at 44-47.)

Within this hierarchy is the concept of tenure, or "virtual lifetime employments." (Id. at 41.) At UAB, tenure represents a recognition of a certain status, which includes years of service, a demonstrated level of scholarship, classroom teaching, and level of service to the community. (Id. at 54-55.) It

generally takes six years for an individual to be tenured.  (Id.)  At UAB, the process begins with an application and review in the spring of the professor's sixth year. (Id. at 48.)  The professor is reviewed in his or her department and by the department chair.  (Id.)  He or she is also reviewed by the School of Business promotion and tenure committee, and finally by the Dean.  (Id.)

2.  Salary

In general, faculty salaries are calculated on a nine month basis because most faculty do not teach in the summer.  (Holmes Dep. at 36-37.)  Dean Holmes testified that the single greatest factor in the School of Business at UAB regarding faculty compensation is performance and merit.  (Id. at 110.)  In terms of weighting, "teaching and research have roughly an equal weighting," and "service is secondary relative to the mission of teaching and research."  (Id.)

Starting salaries for faculty hired in the School of Business are now considerably higher than they were when Key was first hired.  (Key Dep. at 251.) In fact, Key testified that they had "probably almost doubled."  (Id.)  One of the consequences of the higher starting salaries is a phenomenon called salary compression.[6]  Salary compression occurs where experienced employees have

---

[6] Although both Key and Dean Holmes testified about salary compression, neither party made any attempt to explain to the court the concept of salary compression, which is of great relevance to this case.  The court had to resort to internet research to understand this concept.

earnings that do not reflect their years of service, relative to new hires. See Snyder, J.K., G.W. McLauglin, and J.R. Montgomery. "Diagnosing and Dealing with Salary Compression." Research in Higher Education, vol. 33, at 113-24 (Feb. 1992). Supply and demand conditions in the labor market result in junior employees with less maturity earning more than senior ones. Academic administrators faced with the possibility of classrooms with no teachers are forced to pay entry-level market prices which are usually high in professions such as business education. (See Holmes Dep. at 142.) Compression often results in salary inversion where entry-level faculty make more than others. This phenomenon is then coupled with the inability of universities to make adjustments to the entire salary structure of a faculty. The final piece of the compression problem is added by the decreasing portion of state budgets that are going to higher education, in general, and for faculty salary increases in particular. See Brian Rungeling, "Academic Salary Compression: a productivity model as a remedy," Public Personnel Management (Winter 1996).

Dean Holmes testified that he was familiar with the issue of salary compression. (Holmes Dep. at 66.) In 2002, the business school received a "three percent pool for merit pay increases and a small pool of . . . catch-up . . . funds to permit salary adjustments for faculty whose salary is below the average for their

10

particular discipline and rank based on the comparison with the average salaries on the Southern University Group." (Id. at 74.)  This money affected raises for the 2002-2003 academic year.  (Id.)  "All raises including catch-up were based strictly on merit and overall performance of the individual."  (Id. at 75.)

In the MMID department of the School of Business, there are four tenured associate professors: Douglas Ayers, Vickie Cox-Edmondson, Karen Kennedy, and Key.  (Ex. 2 to Key Dep.)  There are four non-tenured associate professors in the MMID: Eric Jack, Philip Musa, Robert Underwood, and Barbara Welch.  (Id.)  The following chart represents the salaries of each faculty member in the academic year 2004-2005, rank, and date of employment, and starting salary:[7]

| NAME | RANK | SALARY | EMPLOY. DATE | STARTING SALARY |
|---|---|---|---|---|
| Susan Key | Associate | $83,860 | 9/1/95 | $53,000 |
| Vickie Cox-Edmondson | Associate | $81,115 | 8/15/96 | $64,000 |
| Douglas Ayers | Associate | $97,200 | 8/15/99 | $72,500 |
| Philip Musa | Assistant | $85,666 | 9/1/00 | $76,000 |
| Eric Jack | Assistant | $95,250 | 8/15/01 | $78,000 |
| Karen Kennedy | Associate | $102,000 | 8/15/01 | $80,000 |
| Robert Underwood | Assistant | $95,200 | 8/15/01 | $80,000 |
| Barbara Welch | Assistant | $84,586 | 8/15/01 | $75,000 |

---

[7] The chart is organized chronologically by date of employment.

3.  Raises

As relevant to this case, raises to salaries are funded by each academic

school.  (Holmes Dep. at 67.)  The Provost sets the general guidelines and then

each school generates the money for raises through tuition and fees, as well as

credit hour production[8] from state allocations, and any other funds raised from the

outside  (Id. at 68, 70.)  There is not a pool of money allocated to each school for

raises.  (Id. at 68-69.)

The actual percentage and amount of each raise is determined by a

committee composed of the Dean, associate Dean and the department chairs.  (Id. at

75.)  The process begins with a faculty member's submission of an annual

information or SEDONA form[9] to the department chair.  (Id. at 111-12.)  The

department chair then performs an annual evaluation of each faculty member in his

department.  (Id.)   Then, usually in July, the committee looks at both what the

faculty member submitted in the SEDONA form and the two annual reviews by the

department chair.[10]  (Id. at 76, 84-85, 114.)  The committee considers a faculty

_____

[8] Under the ACHE, Alabama Commission on Higher Education, formula, each school
generates funds based on credit hours at certain levels of disciplines.  (Holmes Dep. at 68.)

[9] This form is an annual report of the faculty member's activities for a given year.
(Holmes Dep. at 112.)

[10] The department chair's evaluation is based on the faculty information form and an
assessment of data that the faculty member submitted, such as teaching evaluations or copies of

12

member's performance in terms of teaching, research and service.  (Id. at 84.)  In addition, the department chairs meet and group faculty in corresponding categories of excellent, very good, average/satisfactory and poor/unsatisfactory performance. (Id. at 115.)  Although a faculty member receives excellent reviews within a particular department, he or she "may not fair quite as well" when compared to a faculty member in another department.  (Id. at 118.)  After reviewing all the information, the committee then has "a discussion and try as best [they] can in [their judgment] to make calls" by "comparing individuals across the school."  (Id. at 76.)

Key's salary history shows that since the 2000-2001 academic year, Key was awarded a higher than average raise three of seven years.  (Ex. 1 to Messina Dep.) She was awarded the average raise in one of the seven years, and a below average raise in one of the seven years.  (Id.)  There was no raise given in two years.  (Id.) The following chart represents Key's raises, in terms of actual numbers and percentages, and includes the average raises given for each year:[11]

---

articles or service accomplishments or other awards.  (Holmes Dep. at 112.)

[11] The chart does not include money received as the result of promotion or any administrative stipends.

| YEAR | NUMBER INCREASE | PERCENTAGE | AVERAGE PERCENTAGE |
|---|---|---|---|
| 2000-01 | $5,135 | 7.3% | 5.0% |
| 2001-02 | -- | -- | -- |
| 2002-03 | $6,600 | 6.5% | 5.0% |
| 2003-04 | -- | -- | -- |
| 2004-05 | $1,710 | 2.1% | 5.0% |
| 2005-06 | $6,619 | 7.9% | 6.0% |
| 2006-07 | $5,968 | 5.0% | 5.0% |

### B.  "Pork Chop" Incident and Investigation

In January or February 2004, two members of the administrative support staff, Lisa Aaron and Cassandra Walker,[12] approached Key about Dr. Robert Underwood.[13]  (Key Dep. at 90-92.)  Aaron and Walker told Key that on multiple occasions, Underwood performed a stand-up routine in which he impersonated a retarded, old, crotchety black man, named "Pork Chop."[14]  (Id. at 91.)  The women told Key that they were "very insulted by this" and that they asked him to stop. (Id.)  Underwood, however, continued his performance.  (Id.)  Aaron and Walker

---

[12] Aaron and Walker are African American.  (Key Dep. at 95.)

[13] Key testified that because she teaches ethics, "quite often the staff will come to [her] when there's an issue that they are concerned about."  (Key Dep. at 90.)  Further, she stated that the staff "know[s] that [she is] someone who will stand up if there's an issue regardless of the repercussions."  (Id.)

[14] Key never personally witnessed Underwood perform this impression.  (Key Dep. at 92.)

14

informed Key that they had complained about "other, what they felt were, racist acts by" Underwood, but that this incident "was the last straw."  (Id.)  When Underwood would not stop, the women decided to voice their concerns to Key. (Id.)

In response, on February 4, 2004, Key "sent an e-mail to the Dean and the Associate Dean and . . . asked them to handle this problem."  (Id.; Ex. 5 to Holmes Dep.)  Key asked that her confidentiality be preserved because she "didn't want to be involved. [She] thought that the Dean could just handle it very easily by . . . asking him to stop doing this.  It was offending the staff." (Id. at 94.)  Key also testified that Underwood had treated her disrespectfully in the past, and she saw him "as a bit of a bully."[15]  (Id.)

Dean Holmes asked Dr. George Munchus, the chair of the diversity committee which was created by Munchus and Key to discuss and deal with issues of diversity,[16] to look into the situation. (Id. at 101-02.)  According to Key, the

---

[15] A week after the complaints about Underwood's behavior, he was promoted to be the School of Business Executive Education Director. (Key Dep. at 101.) Key testified that, in her opinion, the promotion was unusual because administrators usually have to be tenured, and Underwood had not yet been through the tenure process. (Id.)

[16] The diversity committee was a self-appointed, voluntary committee.  To form the committee, Munchus and Key sent out an email to their faculty colleagues, asking for volunteers to populate the diversity committee. (Key Dep. at 104.) Dean Holmes was an ex officio member of the committee, and Dr. Munchus, Dr. Key, Dr. Frank Watkins, Dr. Brad Wilson and Dr. Vickie Cox-Edmondson were the other members. (Id. at 104-05, 107.)

committee did not want to investigate the matter because the committee had originally been organized to promote diversity within the business school, not to act as a grievance committee. (Id. at 102,106, 108.)  Key testified that the committee agreed only after Dean Holmes insisted that the committee investigate the matter. (Id. at 106, 108.)

The diversity committee heard testimony on the events from both eyewitnesses and  Underwood.  (Id. at 102).  On March 1, 2004, Underwood met with the committee and "explain[ed] his regret concerning the incident.  He stated that he had apologized" to the complaining parties, and "presented a length[y] verbal statement at the beginning of the committee meeting clearly expressing responsibility and remorse for his actions.  He recognized that his actions did indeed offend, although that was certainly not the intention."  (Ex. 5 to Key Dep.)  Then, on March 3, 2004, the offended parties met with the committee.  (Id.)  They stated that they had been offended and "expressed concern that the initial apologies offered . . simply made them feel worse."  (Id.)  In addition, "some significant concern was expressed that the apologies were not sincere," and that Underwood did not understand how they could be offended if it was not his intent to offend. (Id.)  However, after further questioning by the committee, the offending parties "indicated they believed the offending party's apology was indeed sincere and he

did 'get it' regardless of intent.  They also indicated they were satisfied and could maintain a professional and healthy working relationship going forward."  (Id.)

On April 14, 2004, the diversity committee disseminated a report of their findings regarding the incident.  (Id.)  Each individual committee member submitted recommendations in response to the investigation.  (Id.)  The recommendations included that Underwood receive diversity training, withdraw his tenure application for one year until diversity training is complete, step down from his leadership position as Director of Executive Education until diversity training is complete, and that he write a short essay on what he learned from the diversity training and share this essay with the diversity committee.  (Id.)  After the report was circulated, the diversity committee had a meeting with Dean Holmes.  (Key Dep. at 112.)  According to Key, Dean Holmes did not understand why Underwood's behavior was offensive.[17]  (Id. at 112-13.)  In Dean Holmes's written response to the diversity committee proceedings, Dean Holmes accused the diversity committee members of having a "vendetta" against Dr. Underwood, and that, in his opinion, the matter had been blown out of proportion. (Ex. 5 to Holmes Dep.)

---

[17] In contrast, Dean Holmes testified that he "certainly" understood why the conduct was offensive.  (Holmes Dep. at 151.)

17

### C.  2004 Pay Raise

In July 2004, about three months after the conclusion of the investigation into the "Pork Chop" incident, raises were determined for the years 2002 and 2003.[18]  Key received excellent ratings in her department, but was given the lowest percentage raise.  Dean Holmes testified that although Key ranked high in her department, she was not ranked in the highest raise categories when compared to other professors school-wide.  (Holmes Dep. at 118; Ex. 1 to Messina Aff.)  Although Key testified that her raise notification letter stated that she received a raise of 1.8 or 1.9 percent (Key Dep. at 88), the documents from the University reflect that her raise was actually 2.1 percent.  (Ex. 2 to Key Dep.)   The average raise for that year was 5 percent.  (Holmes Dep. at 208.)

Key contends that her low raise was in retaliation for her work on the diversity committee regarding the "Pork Chop" incident.  Another member of the diversity committee, Dr. Vickie Cox-Edmondson, a black female associate professor, was the only professor in the business school to receive a lower raise than Key.  (Key Dep. at 90; Ex. 2 to Key Dep.)   The chair of the committee, Dr. George Munchus, received a 6.1 percent raise.  (Ex. 2 to Holmes Aff.)

---

[18] Although the 2004 raise would normally reflect work performed only in 2003, no raises were given in 2003 so the 2004 raises included 2002 and 2003 performance.  (Key Dep. at 85-86.)

18

### IV.  General Framework

In an employment discrimination case, like the one here, a plaintiff maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 134 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-12 (1993); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), as modified by Desert Palace v. Costa, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).[19]

Under the McDonnell Douglas and Burdine framework, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997).

---

[19] Key only argues that she has established a circumstantial case of discrimination and retaliation.  (See Pl. Opp. Br. at 12-25.)

The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix, 738 F.2d at 1185 (11th Cir. 1984); Lincoln v. Bd. of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  Once the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  See Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2001); Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[20]  A plaintiff may accomplish this by *either* proving by a preponderance of the evidence that intentional discrimination did indeed motivate the defendant *or* by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus

---

[20] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

20

permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves, 530 U.S. at 147-48;  St. Mary's Honor Ctr., 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).  A plaintiff may also prove pretext by presenting sufficient evidence  for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-54; Desert Palace, 539 U.S. at 101-02.

## V.  Discussion

Plaintiff's complaint contains the following claims: (1) disparate treatment in pay in violation of Title VII; (2) unequal pay in violation of the Equal Pay Act; and (3) retaliation in violation of Title VII.  Defendant's motion for summary judgment asserts that plaintiff's claims fail as a matter of law   The court addresses plaintiff's pay claims together, and then addresses her retaliation claim.

21

*A. Title VII Sex Discrimination Claim for Unequal Pay*
*and Equal Pay Act Claim*

Gender-based discrimination in rates of pay to employees is prohibited by the Equal Pay Act of 1963 (EPA), which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d) (1976), as well as by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  The EPA was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex.   Title VII also forbids discrimination on the basis of gender, among other protected traits.  Thus, plaintiff has two tools for relief, of which both provide different burdens of proof and may produce different amounts of compensation.  See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1527 (11th Cir. 1992).

## 1.  Equal Pay Act

To establish a prima facie case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"  Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).   To establish a prima facie case, a plaintiff need only demonstrate that the jobs at issue are

22

substantially similar, not identical; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent.  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992).  The burden of proving that the jobs are equivalent is difficult to meet and is a more difficult burden than the comparison which must be made to support a Title VII claim.  Id. at 1526.

Once a plaintiff makes out a prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of four exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex.  See 29 U.S.C. § 206(d)(1).  The burden to prove these affirmative defenses is heavy, and the defendant must demonstrate that " the factor of sex provided no basis for the wage differential."  Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590 (11th Cir.1994).   In fact, the Eleventh Circuit has noted "the difficulty inherent in disposing of such an issue by way of summary judgment" because "[c]redibility and the weight to be given such 'explanations' are traditionally matters left to the consideration of fact finders."  Id. at 595.

If the employer fails to meet its burden, the plaintiff wins; plaintiff is not required to prove discriminatory intent on the part of the defendant.  See Mitchell

v. Jefferson County Bd. of Ed., 936 F.2d 539 (11th Cir. 1991).  "When the

defendant overcomes the burden, the plaintiff must rebut the explanation by

showing with affirmative evidence that it is pretextual or offered as a post-event

justification for a gender-based differential."  Irby v. Bittick, 44 F.3d 949, 954

(11th Cir. 1995) (citing Schwartz v. Florida Bd. of Regents, 954 F.2d 620, 623

(11th Cir. 1991); Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1045 (5th Cir.

1973)).  If plaintiff is able to create the inference of pretext, there is an issue which

should be reserved for trial.  Irby, 44 F.3d at 954.

   In its initial brief in support of summary judgment, defendant does not

discuss whether plaintiff established a prima facie case under the EPA.  (See Def.

Br. at 11-12.)  In its reply brief, however, defendant contends "plaintiff's prima

facie case is defeated by the undisputed evidence showing that other female

associate professors and assistant professors have received higher raises than other

male professors."[21]  (Def. Reply Br. at 4.)  Defendant does not cite any authority for

the proposition that a plaintiff cannot establish a prima facie case because there are

some females that are paid more than the plaintiff's male comparator, and the court

---

   [21] The court is somewhat confused by defendant's argument.  Plaintiff is not merely
complaining about her raise.  Instead, she is complaining about her overall pay and the fact that a
male associate professor, Douglas Ayers, and all the male assistant professors are paid more than
she is paid.

has been unable to find any authority supporting this argument.

Instead, the statute states and cases hold that the plaintiff has to show that his or her employer pays different wages to employees of the opposite sex "'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).  It is undisputed that Key is paid less than the only male tenured associate professor, Douglas Ayers, and that she is paid less than the three male assistant professors.  (Ex. 2 to Key Dep.)  In addition, defendant does not make any argument regarding the requirement that the comparators hold jobs that are equal in skill, effort, and responsibility.  Even though the plaintiff's burden is high in this regard, see Waters v. Turner, Wood, & Smith Ins. Agency, Inc., 874 F.2d 797, 799 (11th Cir. 1989), the court will not make this argument for defendant and, therefore, assumes that plaintiff has met her burden of establishing this element of her prima facie case.  As such, the court finds that, for the purposes of the pending motion for summary judgment, Key has established a prima facie case under the EPA.

Because Key established a prima facie case, the burden shifts to the defendant to establish one of the four affirmative defenses.  As stated above, this

25

"burden is a heavy one."  Mulhall, 19 F.3d at 591.  Defendant argues that, under

the fourth exception, it has not violated the EPA because Key's lower salary was

based on a factor other than sex.  (Def. Br. at 11-12.)  Specifically, defendant

contends that Key received a lower raise in 2004 because "she was less productive

[in the area of research] when compared to other faculty members" during the

relevant years.  (Id. at 11.)  Under Schwartz v. Florida Bd. of Regents, 954 F.2d

620, 623 (11th Cir. 1991), this reason would be sufficient if the 2004 pay raise was

the only pay disparity at issue in her claim under the EPA.  This raise, however, is

not basis for plaintiff's EPA claim.  The pleadings, evidence, and briefs are clear

that Key's complaint stems from her overall salary, and not merely the small raise

in 2004.  The 2004 pay raise is the basis for her retaliation claim, not her EPA

claim or discrimination claim under Title VII.  Defendant has not presented any

evidence, or made any argument, why the difference in Key's overall salary

between her male counterparts is justified by one of the four exceptions in the

statute.  Simply stated, defendant's presentation falls far short of proving that the

difference in pay is justified by one of the four statutory exceptions.  See 29 U.S.C.

§ 206(d)(1).  One of such exceptions may be present, but it is not the job of the

court to independently examine the record and make this argument for defendant.

As such, because the defendant failed to carry its burden, summary judgment is due

26

to be denied on plaintiff's claim under the EPA.

## 2.  Title VII

A plaintiff may establish a prima facie case of gender discrimination in pay under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males.  Miranda, 975 F.2d at 1527. Once the plaintiff has established the prima facie case, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the disparity. Burdine, 450 U.S. at 255-56.  The burden of production in rebutting the prima facie case is exceedingly light.  See Perryman v. Johnson Prods., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).  Once the defendant has met the burden of articulation, plaintiff must demonstrate that the discriminatory reason more likely than not motivated the employer to pay plaintiff less, or that the employer's explanation is not worthy of belief.  See Burdine, 450 U.S. at 256.

Key established a prima facie case of pay discrimination in violation of Title VII.[22]  It is undisputed that Key is female.  Additionally, she has presented sufficient evidence that males in similar jobs were paid more than she was paid.

---

[22] Although defendant contends in its reply brief that "plaintiff's prima facie case is defeated by the undisputed evidence showing that other female associate professors and assistant professors have received higher raises than other male professors," (Def. Reply Br. at 4), defendant does not cite any authority for this proposition, and the court has been unable to find any authority supporting this argument.  As such, the court rejects this argument.

27

The burden, therefore, shifts to defendant to articulate a legitimate, nondiscriminatory reason for the disparity.  Burdine, 450 U.S. at 255-56.

To satisfy its light burden, defendant states that Key received a lower raise in 2004 because she "did not fare well when compared to other faculty in the school in terms of teaching, research and service" and "her publications were dramatically less than the vast majority of other professors, both male and female."  (Def. Br. at 10, 14.)  This articulated reason satisfies defendant's burden with regard to plaintiff's claim of discrimination regarding her 2004 raise.[23]  The burden therefore shifts back to Key to demonstrate that the alleged discriminatory reason more likely than not motivated defendant to pay her less, or that the explanation is not worthy of belief.  See Burdine, 450 U.S. at 256.  Key has failed to meet this burden.  There is simply no evidence in the record that sex played any role in the determination to award Key a lower raise in 2004.  Moreover, Key has not come forward with or pointed to evidence from which a jury could reasonably conclude that the legitimate, nondiscriminatory reason for the lower raise is unworthy of belief.  As such, defendant's motion for summary judgment on Key's claim of discrimination in her 2004 pay raise is due to be granted.

---

[23] The court is unsure whether plaintiff's complaint actually contains such a claim.  Under a liberal reading of the complaint, however, the court will address this potential claim.

With regard to the alleged discrimination in Key's overall pay, defendant's argument suffers, although not quite as badly, from essentially the same problem as its argument with regard to the EPA claim.  Namely, plaintiff's claim is that she was discriminated against in her overall compensation.  Her discrimination claim does not merely encompass the pay raise in 2004.  While there may be a sufficient reason for the overall salary disparity, defendant has not come forward with or pointed to or argued any reason for the overall salary disparity.  As such, summary judgment is due to be denied on plaintiff's claim of discrimination in violation of Title VII regarding her overall salary.

### B.  Title VII Retaliation

T o establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she engaged in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  See Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999).  Defendant contends that plaintiff cannot establish any element of her prima facie case.  Although the court concludes that in light of Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2409 (2006), the alleged

retaliation[24] could have been materially adverse to a reasonable employee, Key has not established the other two elements of her prima facie case.

### 1. Statutorily Protected Activity

Key did not engage in statutorily protected activity. Title VII's retaliation provisions protect only certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3 (a). And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. Key argues that she engaged in protected activity under both the opposition and participation clauses. (Pl. Opp. Br. at 19-21.) The court disagrees.

Key did not "oppose any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). In support of her opposition argument, Key states in her brief that she "complained about [Underwood's] behavior to Dean Holmes." (Pl. Opp. Br. at 20.) This characterization of the record is misleading.

---

[24] The alleged retaliation is the 2.1 percent raise in comparison to the average raise of 5 percent that year. Key received the second lowest raise of anyone in her department that year.

In her deposition, Key testified that two members of the administrative staff approached her about the imitation performed by Underwood.  (Key Dep. at 90-92.)  She stated that because she teaches ethics, "quite often the staff will come to [her] when there's an issue that they are concerned about."  (Id. at 90.)  Key never personally witnessed the incident.  In response to the staff's complaints to Key, Key sent an e-mail to Dean Holmes and the Associate Dean reporting the staff's complaints.  (Id. at 91.)  There is no evidence that Key was complaining on behalf of the staff members.  Instead, the evidence establishes that Key was merely reporting the staff's complaint to the appropriate persons to investigate.  She was a middle-man who simply passed on the complaints to the Dean and Associate Dean.  These actions are not protected under the opposition clause.

Likewise, Key did not participate "in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3 (a).  "Under this subchapter" refers to subchapter VI of Chapter 21 of Title 42.  See 42 U.S.C. §§ 2000e-2000e-17.  "This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000) (citing Silver v. KCA, Inc., 586 F.2d 138,

31

141 (9th Cir. 1978) (stating that participation means "participation in the machinery set up by Title VII to enforce its provisions")).  "[A]t a minimum, some employee must file a charge with the [E.E.O.C.] (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the participation clause."  Id. at 1174 n 2.  Therefore, Key's participation in the internal investigation by the diversity committee, where no EEOC charge was or had been filed, does not constitute protected expression under the participation clause of Title VII.

Therefore, Key failed to establish the first element of her prima facie case, that she engaged in statutorily protected activity.  Defendant's motion for summary judgment as it relates to plaintiff's claim of retaliation in violation of Title VII is due to be granted.  Out of an abundance of caution, however, the court will continue its analysis in the alternative.

## 2.  Causal Connection

Additionally, even if the activity engaged in by Key was protected activity, Key did not establish a causal connection between the protected activity and the adverse employment action.  To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated.  See id. at

1377.  The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. See id.  On the other hand, the Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer.  See Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999).  Moreover, the Supreme Court has warned that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'"  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citations omitted).

Key presents two arguments to support the causal connection element of her prima facie case: (1) temporal proximity and (2) Dean Holmes's "hostile accusations of improper behavior [by the diversity committee], combined with the subjective manner of evaluating pay raises."  (Pl. Opp. Br. at 22-23.)  Neither

argument holds muster.  First, the three month period between Key's participation in the investigation of the "Pork Chop" incident alone is insufficient to establish a causal connection.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th 1997) (3-month period insufficient)); Higdon v. Jackson, 939 F.3d 1211, 1221 (11th Cir. 2004) (three month lapse between protected activity and adverse employment action insufficient).  Second, Dean Holmes's reaction to the diversity committee is insufficient to establish that Key's alleged protected activity and the adverse action were not wholly unrelated.  There were other members of the committee who decided raises who, although they had knowledge of the investigation, had no reaction to the committee.  There is no evidence that Dean Holmes manipulated the committee and was the sole decisionmaker with regard to the 2004 raises.

Therefore, Key failed to establish the third element of her prima facie case, and defendant's motion for summary judgment as it relates to plaintiff's claim of retaliation in violation of Title VII is due to be granted.  Out of an abundance of caution, however, the court will continue its analysis in the alternative.

### 3. Legitimate, Nonretailatory Reason and Pretext

Even assuming that Key established a prima facie case of retaliation, she has

34

failed to offer evidence sufficient for a reasonable jury to conclude that the legitimate, nonretaliatory reason for the 2.1% raise was pretext for retaliation. As evidence of pretext, Key argues that the reason for the small raise is unworthy of belief because "Key makes less money than all but one professor in her department and because she makes less money than "the more lowly ranked assistant professors" who "are not tenured and did not out perform Dr. Key in 2003-4." (Pl. Opp. Br. at 23-24.)

Plaintiff's argument fails to establish pretext. That Key's salary is less than all but one professor in her department and that three male assistant professors have higher salaries than Key has absolutely no bearing on whether Key was given a lower pay raise in retaliation for engaging in statutorily protected activity. Additionally, these facts do not show any intent on the part of the defendant to retaliate against Key. "The ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Key has failed to come forward with or point to evidence sufficient for a reasonable jury to find the presence of pretext. Therefore, defendant's motion for summary judgment as it relates to plaintiff's claim of retaliation under Title VII is due to be granted.

### VI.  Conclusion

In summary, the court finds that no material issues of fact remain as to the following two claims against defendant The Board of Trustees of the University of Alabama: (1) discrimination with regard to her 2004 pay raise in violation of Title VII and (2) retaliation in violation of Title VII.  As such, defendant is entitled to judgment as a matter of law as to these two claims asserted by plaintiff.  Defendant has failed adequately to support its motion as addressed to the claims of (1) violation of the Equal Pay Act and (2) discrimination in overall pay in violation of Title VII, and as to those claims the motion will be denied.

A separate order will be entered.

**DONE** this the ___12th___ day of June, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE

36